# Hunt v. Commonwealth.

Feb. 13, 1942.

Willis Staton for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

The appellant was indicted for the murder of Ona Hunt, convicted of voluntary manslaughter, and sentenced to five years imprisonment. He appeals, urging that the evidence was insufficient to take the case to the jury, and that in any event, the Court committed reversible error in failing to instruct the jury on involuntary manslaughter.

Ona Hunt and the appellant were first cousins, and on the night of the killing, Ona was very drunk. So belligerent had been his attitude that his wife and several of his companions, all of whom had been drinking, left him on the road near his home as they returned from a picture show in a nearby village. Appellant had spent the greater part of the evening with Alvin Hunt, another cousin, whose wife was a member of the drunken party, and when Alvin's wife reached her home, appellant left the house, followed by Alvin, for the purpose of quieting

Ona and inducing him to come home. They took this action at the suggestion of Alvin's wife, who, according to the testimony of Ona's wife, was one of the causes of the quarrel between her and her husband which caused her to leave him on the road.

Appellant's account of the events leading up to the killing as well as the actual event is fully corroborated by Alvin Hunt. In describing it appellant testified that after Ona had cursed him and he had remonstrated and protested his friendship for Ona:

"* * * he run up and throwed his arm around me and threw me down and my right foot caught the outside of the steel rail and throwed me back and I throwed by hand back to catch like that to keep the back of my head from hitting the far side of the steel rail and he fell on me and I had a thirty-two special in this pocket right here and when I went back that way the gun fell out and he said Oh yes God Dam you and he grabbed at the gun and I grabbed at it and we both got to wrestling over the gun and it went off one time and Alvin was standing on the side of the bank and he run in and said boys don't do that you are going to get killed and he looked at Alvin and said Alvin you aint got a God Damn thing in this and Alvin said well if that is the way you feel I will get out of the way and he stepped back up on the bank and went to jerking at the gun and I went to jerking and I couldn't say which one let the gun off, I feel just as clear as Jesus Christ does, I don't know which one done it, gentlemen I am telling the truth, I don't know which one done it."

One witness for the Commonwealth, who, on cross-examination admitted that he "wasn't to say sober and wasn't to say drunk," and that he had a poor memory because he "had been knocked in the head and run over so much," testified that shortly after 1 o'clock A. M. he saw appellant at the bus station, and that appellant, who appeared to be drinking and in a good humor, said he was going to arrest Ona Hunt. One or more witnesses for the Commonwealth testified that appellant, after the shooting, had tried to make Ona say that appellant had not shot him. Appellant admitted that he had been at the bus station and that he had been drinking a little, and explained his possession of the weapon by stating that he had procured it from his home at the request of

Alvin Hunt, from whom he had originally acquired it in a trade, and who desired to re-acquire it if satisfactory terms could be arranged. In this he was corroborated by Alvin Hunt. The testimony as a whole showed that the relations between the deceased and appellant had been friendly; that during the evening preceding the homicide appellant had made a trip in an attempt to secure a position for deceased's brother; and that the deceased, although repeatedly urged by appellant to tell how the shooting occurred, persistently refused to do so. He told his mother on his death bed some twenty-four hours after the encounter that appellant had shot him, but when asked by her why Perry had shot him, turned his head away and refused to answer. The only eyewitness to the shooting, other than Alvin Hunt, was Mrs. Lizzie Harlow, who, introduced by the Commonwealth, testified that she was awakened between 3 and 4 o'clock in the morning by a shot, went to the window of her house which overlooked the place where the shooting occurred, and heard the second shot fired and saw the light from the gun, that about "two or three minutes" elapsed between the two shots, and that she heard the sound of an argument but nothing that was said until after the second shot when Ona "kindly stumbled up against the bank and got up and told" Perry "you just about killed me," to which appellant responded "no, you pulled your coat over there and jumped on me." She was thirty or forty feet away, and the material part of her testimony, according to the Commonwealth's contention, was her statement that the men were from five to ten feet apart when the second shot was fired. Her exact language in response to a question as to how close together the men were when the shot was fired was, "From the light of the gun, I guess it was from five to ten feet apart." From her cross-examination it would appear that she did not see appellant, but only the deceased, and that her guess as to the distance between the combatants was based upon the apparent distance between the flash and the body of one of the men. While, on the whole, her testimony is irreconcilable with that given by the appellant and Alvin Hunt, we cannot say that it was insufficient to support the jury's evident belief that the killing was neither necessary nor accidental.

In addition to instructing on murder, manslaughter, and self-defense, the Court instructed the jury that it should find the defendant "not guilty" if the shooting

was accidentally done and not intentional. We find it unnecessary to attempt to determine whether, as suggested by the Attorney General, the instruction on accidental shooting was more favorable to the appellant than an instruction on involuntary manslaughter would have been, since there was nothing in the testimony which would have justified an instruction on involuntary manslaughter. Appellant's whole defense was that every act which he committed after encountering the deceased was in defense of his person and that the actual firing of the pistol was accidental. While, as pointed out in the case of Rowe v. Commonwealth, 206 Ky. 803, 268 S. W. 571, the distinction between involuntary manslaughter and accidental killing has not always been clearly observed, the distinction is clearly illustrated by the definition of accidental killing given in 13 R. C. L. 863:

"When it appears that a killing was unintentional; that the perpetrator acted with no wrongful purpose in doing the homicidal act; that it was done while he was engaged in a lawful enterprise; and that it was not the result of negligence, the homicide, will be excused on the score of accident. Action accompanied, not only with no intent to do harm but under a reasonable belief that no harm is possible, is clearly wanting in every essential element of crime."

Involuntary manslaughter is the killing of another person in doing some unlawful act not amounting to a felony and not likely to endanger life, and without an intention to kill, or where one kills another while doing a lawful act in an unlawful or negligent manner where the negligence is not such as to indicate a disregard for human life.

While, if sitting as jurors, we might have refused to concur in the verdict rendered, because of our belief that the testimony preponderates in favor of appellant's contention that he acted throughout his encounter with the deceased in what appeared to him to be his necessary self-defense, it is not within our province to substitute our view for that of the jury's; and, since we are unable to find any testimony in the record on which an instruction on involuntary manslaughter could have been properly predicated, or any error committed by the Court prejudicial to appellant's substantial rights, we have no alternative but to affirm the judgment, and, it is so ordered.